UNITED  STATES  DISTRICT  COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                              :

BEMATECH HOLDINGS LLC           :
                              :      Case No. 1:22-cv-7873
                    Plaintiff,     :
                              :
           -against-        :
                              :      **COMPLAINT**
TOTVS  LARGE  ENTERPRISE  TECNOLOGIA S.A. :
f/k/a BEMATECH S.A. and TOTVS S.A.     :
                              :
                 Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

      Plaintiff Bematech Holdings LLC ("**Purchaser**" or "**Plaintiff**"), by its attorneys, Sullivan

& Worcester LLP, for its Complaint against Defendants TOTVS Large Enterprise Tecnologia S.A.

f/k/a Bematech S.A. ("**Seller**") and TOTVS S.A. ("**Parent**" and, with Seller, "**Defendants**"), avers

as follows:

## <u>NATURE OF THE ACTION</u>

      1.     This action arises out of Defendants' breaches of representations, warranties, and

covenants in connection with a stock purchase agreement (the "**SPA**") pursuant to which Plaintiff

purchased  all  stock  of  Bematech  International  Corporation  (the  "**Company**"),[1]  Defendants'

subsequent refusal to honor their obligation to indemnify Plaintiff for its resulting losses relating

to  those  breaches,  as  well  as  Defendants'  tortious  misrepresentations  and/or  omissions  which

induced Plaintiff to enter into the SPA.

      2.     In short, the Defendants failed to convey the business and assets as required by

the SPA, and those which Defendants did convey were not as represented.  Among other things,

Defendants:

---

[1] A copy of the SPA is annexed as <u>Exhibit A</u>, with certain schedules omitted (where indicated) in
order to protect commercially-sensitive information.

a.  Sold to another company critical intellectual property that Defendants had agreed to sell to Plaintiff;

b.  Sold Plaintiff intellectual property the legal protection of which had expired;

c.  Sold Plaintiff an entity which no longer had legal authority to operate, was rife with fraudulent activity, and whose principal assets had been lost or stolen;

d.  Violated and/or failed to prevent Defendants' successor from violating non-competition and non-solicitation covenants; and

e.  Failed to disclose material liabilities faced by the target company.

3.  These acts of Defendants breached representations, warranties, and covenants contained in the SPA.  Compounding the injuries caused by these material breaches, Defendants then breached their contractual obligation to indemnify Plaintiff for its damages.

4.  Plaintiff brings this action to recover its damages resulting from Defendants' breaches.  Based on Defendants' wholesale failure to perform and provide the consideration required by the SPA, Plaintiff additionally seeks a declaratory judgment voiding an unmatured, interest-bearing $1.5 million Promissory Note (the "**Note**") issued to Seller or, alternatively, affirming Plaintiff's offset of any sums due thereunder against Plaintiff's damages in accordance with Section 6.2(f) of the SPA.[2]

## THE PARTIES

5.  Plaintiff is a Delaware limited liability company with its principal place of business located at 404 Sunport Lane, Suite 550, Orlando, Florida 32809.  Plaintiff's two members are an individual who is domiciled in New York and a California limited liability company whose two members are each citizens of California.  Accordingly, Plaintiff is a citizen of New York and

---

[2] A copy of the Note is annexed as Exhibit B.

California for the purposes of diversity jurisdiction.

6.     Upon information and belief, Seller is a foreign company, formerly known as Bematech S.A., which is organized under the laws of Brazil with its principal place of business located at Ave. Braz Leme, 1.000, Santana, Sao Paulo, SP, Brazil 02511-000.  Accordingly, Seller is a citizen of Brazil for the purposes of diversity jurisdiction.

7.     Upon information and belief, Parent is a foreign company organized under the laws of Brazil with its principal place of business located at Ave. Braz Leme, 1.000, Santana, Sao Paulo, SP, Brazil 02511-000.  Accordingly, Parent is a citizen of Brazil for the purposes of diversity jurisdiction.  Upon information and belief, Parent is the parent company to Seller.

## JURISDICTION, VENUE AND APPLICABLE LAW

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because pursuant to Section 8.10 of the SPA the parties designated this District as the venue for adjudication of any disputes "arising out of or relating to" the SPA or the transactions contemplated therein.

10.    Each Defendant has agreed to submit to personal jurisdiction in this Court pursuant to Section 8.10 of the SPA.

11.    Section 8.9 of the SPA provides that the agreement "shall be governed by and construed in accordance with the domestic laws of the State of New York without giving effect to any choice of law or conflict of law provision (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York."

3

## FACTUAL BACKGROUND

**I.      Plaintiff's Acquisition of the Company Pursuant to the SPA**

12.      The Company (*i.e.,* Bematech International Corp.) and its wholly-owned subsidiaries, Logic Controls, Inc. ("**LCI**") and Bematech Foshan Shunde Ltd. ("**FICE**" and with LCI, the "**Subsidiaries**"), are in the business of providing business automation hardware and software.  Prior to the events at issue in this case, Seller owned the Company (and, by extension, the Subsidiaries).  Parent, in turn, owns Seller.

13.      On or about July 3, 2019, following several months of discussions and negotiations, Plaintiff and Defendants entered into the SPA pursuant to which Plaintiff agreed to pay Seller $5 million (the "**Purchase Price**") for all the outstanding stock of the Company, subject to certain price adjustments.  Accordingly, the SPA also provided for Plaintiff to acquire LCI and FICE, as they were the Company's direct and indirect wholly-owned subsidiaries (collectively with the Company, the "**Acquired Entities**").  The below chart summarizes the structure of the Acquired Entities which Seller agreed to convey to Plaintiff:



14.      The acquisition closed on or about November 6, 2019 (the "**Closing**" or "**Closing Date**").

15.      The Purchase Price consisted of (i) a $3.5 million cash payment made by Plaintiff to Seller at Closing, and (ii) the Note, which ostensibly matures on November 5, 2022.

16.     Pursuant to Article III of the SPA, Defendants, jointly and severally, made a number of representations of present facts and provided a number of warranties expressly "as a material inducement to the Purchaser to enter into" the SPA.  *See* Ex. A (SPA), Article III.

17.     Defendants also jointly and severally agreed to indemnify Plaintiff and the Company (along with, *inter alia*, their respective officers, directors, parents, subsidiaries, successors and assigns) for Losses (as defined in Article I of the SPA) sustained as "as a result of or relating to" either Defendant's breach of any representation or warranty, *see* SPA, § 6.2(a)(i), or any covenant or agreement made by either Parent or Seller.  *See* SPA, § 6.2(a)(ii).

18.     As explained in more detail below, Defendants concealed or wrongfully failed to disclose certain material facts prior to Closing and breached numerous representations, warranties, and covenants in the SPA.  As a consequence, Plaintiff sustained significant damages, including due to its resulting inability to protect and enforce critical intellectual property rights.

## II.     Breaches and Misrepresentations Regarding Intellectual Property

19.     Much of this dispute concerns intellectual property which is squarely addressed in the SPA.[3]

20.     The  SPA provides for the transfer of Proprietary Rights, not merely those that the Company ostensibly owned, but also those "related to the business of the Company" that Seller or its affiliates ostensibly owned (collectively, the **"Company Proprietary Rights"**). *See* SPA, § 3.10(b) (defining the Company Proprietary Rights and cross-referencing a Proprietary Rights Schedule); *see also* SPA, § 2.3(b)(xvi) (providing for an "assignment of Proprietary Rights owned by Seller and its Affiliates related to the business of the Company (excluding the mark 'Bematech' in Brazil)").

---

[3] The SPA provides a comprehensive definition of intellectual property rights.  *See* SPA, § 1.1 (defining **"Proprietary Rights"**).

21.     In sum, the SPA provides for Defendants to convey to Plaintiff these collective intellectual property rights—which relate to the Company's business (whether owned at the time by the Company, the Seller, Parent, or their affiliates), subject to a limited carve-out for the use of the name "Bematech" in Brazil.

22.     Defendants, however, wrongfully deprived Plaintiff of valuable Proprietary Rights—including Company Proprietary Rights—which were essential to the Company's business and which were to be conveyed pursuant to the SPA.  As detailed below, Defendants breached the SPA by, among other things, failing to deliver each of the following intellectual property rights and related assets: (i) the Company's logo; (ii) the Bematech trademark registration in Mexico; and (iii) design documents including drawings and bills of materials for products sold by the Company and/or its Subsidiaries.

### A.     Defendants Failed to Deliver the Logo

23.      Defendants, in contravention of the SPA, failed to convey undiluted rights to the Company's distinctive and globally-recognized logo, consisting of two circular objects (depicted below and referred to herein as the "**Logo**").



24.     Acquiring the Logo was a material inducement for Plaintiff to enter the SPA.  At the time of the SPA's execution, the Logo was highly valuable to the Company.  The Company had used and advertised the Logo, including at soccer matches and in various media, making it

highly recognizable to consumers worldwide and a valuable part of the Company's brand.  The brand and its associated goodwill were material assets of the Company.

25.     The SPA and assignments of intellectual property required thereby provided for Plaintiff's acquisition of indirect ownership of the Logo through the Company: the Logo was a "Company Proprietary Right" because it was "used in or necessary for the operation of the Company's and its Subsidiaries' businesses as currently conducted…." *See* SPA, § 3.10(b).  As a Company Proprietary Right, the Logo was to be conveyed to Plaintiff, either directly as a Company asset or separately pursuant to an assignment by the Seller in accordance with Section 2.3(b)(xvi) of the SPA, which provided for the "assignment of Proprietary Rights owned by Seller and its Affiliates related to the business of the Company (excluding the mark 'Bematech' in Brazil) in form and substance reasonably satisfactory" to Plaintiff.[4]  To that end, Seller executed an assignment at Closing which conveyed to the Company (and, by extension, to Plaintiff) "all worldwide right, title, and interest in and to the Proprietary Rights" owned by Seller and its affiliates "related to the business of the [Company], together with the goodwill associated therewith," except for the marks "Bematech" and "Bemacash" in Brazil.  *See* Exhibit C, § 1.

26.     Indeed, the Logo was expressly included among the scheduled "Company Proprietary Rights" which were to be conveyed under the SPA, as set forth in Section 3.10(a) of the SPA and the accompanying "Proprietary Rights Schedule".  *See* SPA, Schedule III.3.10.a (including the "Bematech Logo" with Peruvian Trademark Registration Number 492878).

---

[4] The carveout in Section 2.3(b)(xvi) for the mark "'Bematech' in Brazil" pertains only to the word mark for the  "Bematech" name, which was distinct from the Logo.  Likewise, Section 7.5(c) of the SPA contains a limited carveout which permitted Seller "to use the ***names*** 'Bematech' and 'Bemacash'" [emphasis added] for sales in a limited number of countries to certain customers who were based in Brazil, but it contained no such provision with respect to the use of any logo.
.

Moreover, the term "logos" is also specifically included in the SPA's definition of "Proprietary Rights."

27.    Defendants did not disclose to Plaintiff the existence of any separate registration or rights to the Logo that would not be conveyed under the SPA.

28.    The SPA further provided, among other things, that the Company "own[ed] and possess[ed] free and clear … all right, title, and interest in and to, or has the right to use pursuant to a valid and enforceable license" all Company Proprietary Rights.  *See* SPA, § 3.10(b).

29.    After signing the SPA, however, but before the Closing, Defendants purportedly transferred the Logo to a third-party.  Upon information and belief, on or about October 24, 2019— *i.e.*, between the signing the SPA (July 3, 2019) and the Closing (November 6, 2019)—Parent and/or Seller purportedly assigned the rights to the Logo in Brazil to a third party, Grupo Elgin and/or its affiliates (collectively, "Elgin").  This meant that the Company no longer had the rights to the Logo, and that Plaintiff did not receive rights to the Logo (and associated goodwill) as provided by the SPA.  In other words, Defendants effectively sold the same property to Elgin that it had already agreed to sell to Plaintiff.

30.    Plaintiff was aware at the time it entered the SPA that Defendants were contemplating selling a portion of Defendants' business in Brazil.  Plaintiff requested that Defendants provide a copy of any such contract or a summary of its terms, though Defendants refused to do so.  In any event, Plaintiff negotiated the SPA to provide expressly that the Logo would be encompassed by the SPA, such that the Company (and by extension, Plaintiff) would retain rights to the Logo and all of the Company Proprietary Rights globally, with the exception of the names "Bematech" and "Bemacash" in Brazil, as set forth above.

31.     Upon Closing, Defendants reiterated their representations, warranties and covenants regarding the Logo.  Section 6.1 of the SPA provides in relevant part that "[a]ll representations, warranties, covenants and agreements set forth in this [SPA] … shall survive the Closing Date."  However, despite that covenant, Defendants did not convey to Plaintiff the rights to the Logo.

32.     Defendants' conduct constituted a material misrepresentation of present facts and further materially breached the SPA, as a result of which, Plaintiff has been deprived of the right and ability to use the Logo in strategic countries, including, but not limited to, Brazil and Mexico.

33.     Furthermore, Elgin has used the Logo in connection with the sale of its own products, causing market confusion among not only consumers but also the Company's vendors and distributors.  Such use has damaged the Company's reputation and resulted in further financial harm to Plaintiff.  As a result, Plaintiff has had to rebrand, selling products under the "Logic Controls" brand and thereby losing the market recognition of the Logo and branding for which  it had bargained under the SPA.

34.     In failing to convey the Logo to Plaintiff, Seller breached the covenants set forth in Section 2.3(b)(xvi), among others.  Defendants' failure to convey the Logo to Plaintiff—as demonstrated by Elgin's undisclosed purported ownership and/or rights to the Logo—also constituted a breach of numerous representations and warranties in the SPA regarding Proprietary Rights, including, without limitation, those representations and warranties set forth in:

a.  Section 3.10(a), which provides in relevant part that:

The Proprietary Rights Schedule sets forth a complete and correct list of all of the following that are owned by the Company and its Subsidiaries[:] (i) patented or registered Proprietary Rights and pending patent applications or other applications for registrations of Proprietary Rights; (ii)  material  unregistered  trademarks,  material

9

unregistered service marks, trade names, corporate names, and Internet domain names; (iii) material unregistered copyrights, including proprietary software; and (iv) any other Proprietary Rights;

b.  Section 3.10(b), which provides in relevant part that:

Except as set forth on the Proprietary Rights Schedule, … the Company and its Subsidiaries own and possess free and clear of all Liens (except Permitted Liens), all right, title, and interest in and to the Proprietary Rights set forth on the Proprietary Rights Schedule and own and possess free and clear of all Liens (except Permitted Liens), all right, title, and interest in and to, or has the right to use pursuant to a valid and enforceable license agreement set forth on the Contracts Schedule, all other Proprietary Rights used in or necessary for the operation of the Company's and its Subsidiaries' businesses as currently conducted and as currently proposed to be conducted (collectively, the "Company Proprietary Rights") … The Proprietary Rights Schedule sets forth each Company product and the Company Proprietary Rights used in connection with such product. The Proprietary Rights Schedule indicates which entity owns the Company Proprietary Rights as of the date of this Agreement and which entity will own the Company Proprietary Rights at Closing pending the finalization of any registration processes. The Proprietary Rights Schedule sets forth each licensee (inbound or outbound) of each Company Proprietary Right;

c.  Section 3.10(d), which provides in relevant part that:

The consummation of the transactions contemplated hereunder will not result in the material loss or impairment of or payment of any material amounts with respect to, nor require the consent of any other Person in respect of, the Company's right to own, use or hold for use any Proprietary Rights as owned, used or held for use in the conduct of the Company's business or operations as currently conducted;

d.  Section 3.10(e), which provides in relevant part that:

The Company's rights in the Company Proprietary Rights are valid, subsisting and enforceable;

e.  Section 3.10(f), which provides in relevant part that:

> The conduct of the Company's business as currently and formerly conducted, and the products, processes and services of the Company, have not infringed, misappropriated, or otherwise violated, and do not and will not infringe, misappropriate or otherwise violate the Proprietary Rights or other rights of any Person; and

f.  Section 3.11(a), which provides in relevant part that

> [E]ither the Company or its Subsidiaries (and not any shareholder of the Company or any other Person) own good and marketable title to, or a valid leasehold interest in, or license of, or right to use free and clear … all of the properties and assets (whether real, personal, or mixed and whether tangible or intangible, including the right to any commissions associated with the Company's or its Affiliates' activities) which are shown on the Balance Sheet, or which are located on the Real Property Schedule, or which are used by the Company or its Subsidiaries….

35.     As a result of Defendants' breaches and misrepresentations and/or omissions regarding the foregoing, Plaintiff has suffered significant losses in the form of lost profits, rebranding costs and reputational damage in an amount to be determined at trial.

**B.     Defendants Failed to Deliver the Mexican Trademark**

36.     Defendants further breached SPA Section 2.3(b)(xi), as well as the representations and warranties in Sections 3.10, when they wrongly caused certain intellectual property rights to expire before the Closing, including an important trademark registration used in connection with the Company's business in Mexico.

37.     Pursuant to the SPA, Defendants were obligated to convey the "Bematech" trademark in Mexico, Registration Number 1177368 (the "**Mexican Mark**").  *See* SPA, Schedule III.3.10.a.iii (including the Mexican Mark on list of Non-US Trademark Registrations and Applications).  Unbeknownst to Plaintiff, however, and contrary to Defendants' representations

11

and warranties, the Mexican Mark had expired prior to Closing.  To the extent Seller purported to assign the Mexican Mark upon Closing, such assignment was, in fact, illusory.

38.     Promptly after discovering that the Mexican Mark had expired (which it did not discover until after Closing), Plaintiff tried to mitigate its damages by seeking to re-register the Mexican Mark and filing Mexico Trademark Application No. 2502711 with the appropriate agency, the Mexican Institute of Industrial Property (IMPI).  On or about April 19, 2021, the IMPI rejected Plaintiff's application for re-registration because it deemed the Mexican Mark to be too similar to the existing Mexican Trademark Registration No. 792012 for "BIMATECH BOTTEROGROUP and design," owned by Bottero S.P.A.

39.     Plaintiff timely filed arguments contesting the rejection; however, the IMPI upheld its refusal to renew the Mexican Mark in a determination dated February 11, 2022 (of which Plaintiff received notice on February 25, 2022).  Plaintiff filed an appeal of the IMPI's decision with Mexico's Federal Tribunal of Administrative Justice and received notice on or about September 7, 2022 that the Tribunal had affirmed the IMPI's decision.

40.     Due to the lapse of the Mexican Mark, the Company has been deprived of the use of its own Bematech name in Mexico (in addition to being deprived of use of the Logo worldwide), resulting in substantial lost sales in that country.

41.     Plaintiff provided notice to Defendants of this indemnification claim in accordance with the SPA on August 24, 2021, and Plaintiff again notified Defendants in or about March 2022 of the IMPI's decision to uphold the refusal.  While Defendants have informed Plaintiff that Plaintiff's claim regarding the Mexican Mark remains purportedly "under further review," Defendants have failed to provide any payments or funds to Plaintiff in connection with Plaintiff's attempts to restore its rights in the Mexican Mark.

42.     Accordingly, Defendants are also in breach of their indemnification obligations pursuant to SPA Sections 6.2(a)(i) and (ii).

43.     As a result of Defendants' breach of representations, warranties, and covenants respecting the Mexican Mark, including but not limited to those contained in Sections 2.3(b)(xi), 3.10 and 3.11(a), Plaintiff has suffered significant losses in the form of lost profits and reputational damage in an amount to be determined at trial.  In addition, Plaintiff incurred expenses, including legal fees in efforts to revive the Mexican Mark, which Defendants have failed to reimburse in contravention of their covenant to indemnify.

### C.     Defendants Failed to Indemnify Plaintiff for Defense of Patent Infringement Suit

44.     Defendants have also violated their obligation to indemnify Plaintiff for costs associated with defending against claims of patent infringement.

45.     On November 23, 2020, a civil lawsuit was filed against LCI in the United States District Court for the District of Delaware, styled as *Altair Logix LLC v. Logic Controls, Inc.*, Case No. 1:20-cv-1578 (the "**Delaware Lawsuit**").  The complaint alleged patent infringement by LCI in connection with its sale of products in the ordinary course of business during pre-Closing periods.

46.     While the Delaware Lawsuit was ultimately dismissed, Plaintiff was required to engage counsel on behalf of LCI, incurring attorneys' fees and costs.

47.     The alleged patent infringement by LCI falls within the purview of Section 3.10(f) of the SPA, in which Defendants represented and warranted in relevant part that the Company's products "have not infringed, misappropriated, or otherwise violated, and do not and will not infringe, misappropriate or otherwise violate the Proprietary Rights or the rights of any other Person."

48.     LCI's costs in defending against and securing dismissal of the Delaware Lawsuit are subject to indemnification pursuant to Section 6.2(a) of the SPA, as the SPA's definition of indemnifiable "Loss" includes claims which "if determined adversely" would give rise to damages. The definition of "Loss" also includes costs related to "the investigation, defense or settlement" of any such claim.

49.     While Plaintiff has provided notice to Defendants of the expenses incurred in connection with the Delaware Lawsuit, Defendants have refused to provide the requested indemnification.

50.     Accordingly, Defendants are in breach of representations and warranties at Section 3.10(f) of the SPA, as well as their obligations under Section 6.2(a).

**D.     Defendants Failed to Deliver Necessary Design Documents**

51.     Defendants have also failed to deliver assets which are essential to the operation of the Company's business, including, without limitation, Computer Aided Design drawings, component placement configurations, Gerber files, bills of materials, and fabrication drawings (collectively, the **"Design Documents"**).

52.     The Design Documents are necessary to manufacture and construct various products sold by the Acquired Entities. In addition to being physical assets of the Acquired Entities which were to be conveyed under the SPA, the Design Documents constitute Company Proprietary Rights pursuant to Article I and Section 3.10(b) of the SPA because they constitute trade secrets and/or know-how (defining "Proprietary Rights" as including "trade secrets, confidential information, know-how and inventions"). As such, the SPA provides for Plaintiff to acquire access to the Design Documents.

53.     Indeed, after Closing the Defendants did not deliver, and Plaintiff has been unable to access, the Design Documents for many products, particularly those that had been made in China through FICE.[5]  Plaintiff discovered that such documents were not actually in the possession of FICE or any other affiliate of the Company at the time of Closing.   Further, many of the Design Documents had been misappropriated by FICE personnel and/or were wrongly maintained by third-party vendors in China, and they remain in the possession of those third parties despite Plaintiff's efforts to recover them.[6]

54.     Without the Design Documents, the Acquired Entities have been effectively deprived of the ability to manufacture the subject products or to contract with new vendors to do so, greatly diminishing the value of the Acquired Entities and the Company Proprietary Rights to Plaintiff.

55.     As a result of Defendants' failure to deliver the Design Documents, Plaintiff was compelled to engage third parties to recreate and document their mechanical, electrical and software design elements.  As an illustrative example, Plaintiff (on behalf of LCI) has spent at least $51,000 to date to recreate a tooling design and prototype for future production of a single product, a kitchen display bump bar designated by model number KB1700.  There are roughly 25 other products for which Plaintiff has undertaken, or will be required to undertake, comparable redesign procedures.  It is estimated that the total cost of such redesigns will be at least $1.9 million.

56.     Making matters worse, Defendants' failure to manage or enforce the Company Proprietary Rights has resulted in the unauthorized manufacture of the products by competitors,

---

[5] FICE is the Company's indirect, wholly-owned subsidiary and had served before the Closing as its procurement and engineering liaison in China.

[6] As a further issue, Defendants never actually completed the steps for the legal transfer of FICE to Plaintiff following the SPA, further impeding Plaintiff's efforts to locate and recover the Design Documents.  *See infra* ¶¶ 61-72.

particularly in China.  Without the Design Documents, Plaintiff has been hindered in enforcing its rights and preventing infringement on the Company Proprietary Rights by third parties.

57.     For example, the design specifications for the "heat-resistant" case for LCI's computer line was, upon information and belief, provided without authorization by a vendor (which had the relevant design documents) to a third-party.  That third-party has since copied the design and now sells a competing product, resulting in lost sales for LCI.

58.     In sum, Defendants marketed and sold the Acquired Entities as a business that designs and builds its own products, which was an essential inducement for Plaintiff to purchase the Acquired Entities.  Without the Design Documents needed for Acquired Entities' operations, Plaintiff has essentially been reduced to the role of mere distributor of third parties' products. Accordingly, Defendants have deprived Plaintiff the fundamental benefit of its bargain under the SPA.

59.     By failing to deliver the Design Documents, Defendants have not conveyed the full scope of assets, including Company Proprietary Rights, as required by the SPA.  Such failure constitutes breaches of numerous representations and warranties in the SPA, including, without limitation, those set forth in:

      a. Section 3.8(a), which provides in relevant part that:

> The Company and its Subsidiaries have not … suffered any change that has had or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or suffered any theft, damage, destruction, or casualty loss in excess of $50,000 in the aggregate to the assets of the Company or its Subsidiaries…or suffered any substantial destruction of books and records;

      b. Section 3.8(e), which provides in relevant part that:

> The Company and its Subsidiaries have not … suffered any extraordinary losses or waived any rights of material value;

c.  Section 3.10(b), which provides in relevant part that:

> [T]he Company and its Subsidiaries own and possess free and clear of all Liens (except Permitted Liens), all right, title, and interest in and to the Proprietary Rights set forth on the Proprietary Rights Schedule and own and possess free and clear of all Liens (except Permitted Liens), all right, title, and interest in and to, or has the right to use pursuant to a valid and enforceable license agreement set forth on the Contracts Schedule, all other Proprietary Rights used in or necessary for the operation of the Company's and its Subsidiaries' businesses as currently conducted and as currently proposed to be conducted…;

d.  Section 3.10(d), which provides in relevant part that:

> The consummation of the transactions contemplated hereunder will not result in the material loss or impairment of or payment of any material amounts with respect to, nor require the consent of any other Person in respect of, the Company's right to own, use or hold for use any Proprietary Rights as owned, used or held for use in the conduct of the Company's business or operations as currently conducted;

e.  Section 3.10(e), which provides in relevant part that:

> The Company's rights in the Company Proprietary Rights are valid, subsisting and enforceable. The Company has taken all reasonable steps to maintain the Company Proprietary Rights and to protect and preserve the confidentiality of all trade secrets;

f.  Section 3.10(f), which provides in relevant part that:

> No Person has, to the best of the Seller's knowledge, infringed, misappropriated, or otherwise violated, or is currently infringing, misappropriating, or otherwise violating, any Company Proprietary Rights; and

g.  Section 3.11(a), which provides in relevant part that:

> [E]ither the Company or its Subsidiaries .... own good and marketable title to, or a valid leasehold interest in, or license of, or right to use free and clear … all of the properties and assets (whether real, personal, or mixed and whether tangible or intangible, including the right to any commissions associated with the Company's or its

> Affiliates' activities) which are shown on the Balance
> Sheet, or which are located on the Real Property Schedule,
> or which are used by the Company or its Subsidiaries….

60.     As a result of Defendants' breach of each of the above-mentioned representations and warranties, Plaintiff has suffered significant losses in an amount to be determined at trial, but which is estimated to be not less than $1.9 million.

**III.     Defendants Misrepresented and/or Failed to Disclose FICE's Lack of Good Standing Under Applicable Law**

61.     As set forth above, the SPA provided for Plaintiff to acquire FICE, as it was the Company's indirect, wholly-owned Chinese subsidiary.  *See* SPA, § 3.1 and Schedule 3.1.a. However, Seller has failed to effectively convey FICE to Plaintiff, in violation of, *inter alia*, Section 2.3(b) of the SPA.  Nor was FICE in good standing under applicable Chinese law at the time of Closing, in contravention of various representations and warranties in Article III of the SPA, as well as Schedule 3.1.a thereof.  As a result, Plaintiff has been left without effective legal control over FICE, depriving Plaintiff of an asset for which it fully paid under the terms of the SPA.

62.     Acquiring FICE was a substantial reason Plaintiff entered into the SPA.  FICE was a material part of the Acquired Entities' business.  In addition to the essential procurement and engineering roles described above, FICE was marketed by Defendants as an import-export operator licensed by the Chinese government.  That license, which is currently difficult to obtain for many companies, allows the holder to operate and bring in revenue from China, as well as to import United States Dollars to China.  Such features were valuable and critical to the Acquired Entities' business.

63.     Importantly, Defendants represented that FICE was in compliance with Chinese law and in connection therewith identified Christian Silva in the SPA as FICE's   legal

representative in China.  *See* SPA, § 3.17 & Schedule III.3.17.  This was false.  FICE was not compliant with Chinese law because it did *not* have a valid legal representative in China, a fact that Plaintiffs did not discover until after the Closing.[7]

64.     Notably, shortly before Closing, Defendants (through their counsel) informed Plaintiff that a successor representative, Fabio Romano, was being appointed and further that Defendants would provide further assistance as needed post-Closing with respect to such appointment.  Defendants, however, failed to complete that appointment, even as they assured Plaintiff in the SPA that FICE remained in compliance with Chinese law.  As a result, at the time of Closing FICE had no legal representative, in contravention of the SPA and in violation of Chinese law.

65.     After the Closing, Plaintiff gained access to historical email communications among Defendants and their counsel which indicated that, in the days leading up to and on the Closing Date, Defendants knew that they needed to take further action to change FICE's management and legal representative under Chinese law, yet they did not do so.  Defendants also did not provide assistance after the Closing as needed for Plaintiff to effectuate such change.

66.     Those communications also revealed that Defendants were aware of problems with accessing FICE's bank account in China, which Defendants also failed to resolve or disclose to Plaintiff.  As a result, Plaintiff was not authorized to access FICE's bank account after the Closing, and has remained unable to do so.

67.     Compounding the problem, Seller also failed to deliver FICE's official corporate "seal" of ownership as required under Chinese law.  This meant that Plaintiff lacked the

---

[7]  In fact, at the time of Closing, "Eros Jantsch" was registered under the China Company Law as FICE's legal representative.  But Jantsch was a *former*, not current, FICE employee and thus ineligible to serve as a representative.

organizational power and authority over FICE (including evidence of ownership) as needed to conduct its business in China after Closing, including with respect to changing FICE's legal representative.

68.     Though Plaintiff obtained Chinese counsel and an outside consultant (incurring associated fees of at least $96,000) following the Closing in an attempt to mitigate its damages, Plaintiff has remained unable to assume full legal control and authority over FICE under Chinese law.

69.     Seller is therefore in violation of its covenant to deliver governing documents and corporate books (including FICE's corporate seal) pursuant to Section 2.3(b)(viii)-(ix) of the SPA. Defendants are further in violation of various representations and warranties, including, without limitation, those set forth in:

> a.   Section 3.1(b), which provided in relevant part that:
>
>> Each of the Company and its Subsidiaries is a corporation duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization, with full organizational power and authority to conduct its business as it is now being conducted [and] to own or use the properties and assets that it purports to own or use . . . . Each of the Company and its Subsidiaries is duly qualified to do business as a foreign organization and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification;
>
> b.   Section 3.1(c), which provides in relevant part that:
>
>> None of the Company nor any of its Subsidiaries "are in default under or in violation any provision of their respective certificates of incorporation or by-laws (or equivalent governing documents);
>
> c.   Section 3.2, which provides in relevant part that:

> Seller has all requisite power and authority … to consummate the transactions contemplated [by the SPA]. No corporate or other proceedings on the part of the Company or its Subsidiaries and no other actions by the Seller are necessary to approve and authorize … the consummation of [such] transactions;

d. Section 3.11(a), which provides in relevant part that the Company and/or its Subsidiaries own good and marketable title to and/or the right to use all of the subject properties and assets;

e. Section 3.17, which provides in relevant part that:

> The 'Officers, Directors, and Bank Accounts Schedule' attached hereto [Schedule III.3.17] lists all officers and directors of each of the Company and each of the Subsidiaries of the Company; and

f. Section 3.19, which provides in relevant part that:

> The Company, its Subsidiaries and each [of] their respective officers, directors, agents (in their capacity as such), and employees have complied in all material respects with and are in material compliance with all Applicable Laws which are applicable to the business, business practices, or any leased properties of the Company and its Subsidiaries and to which the Company and its Subsidiaries may be subject[.]

70.    Defendants' failure to provide Plaintiff with access to or control over FICE's bank account in China further violates the SPA (including Sections 2.3 and 3.17 thereof).

71.    To date, FICE's operations have been effectively suspended.  Thus, not only has Plaintiff been left without a procurement entity in China, but Plaintiff has effectively been deprived of ability to operate and bring in revenue from China, as well as to import United States Dollars to China.

72.    As a result of Defendants' misrepresentations and omissions regarding FICE's compliance with applicable laws, as well as Seller's failure to convey ownership of FICE in

accordance with the SPA, Plaintiff has sustained damages including, but not limited to, the portion of the Purchase Price paid attributable to FICE, as well as lost profits from failing to have a functional Chinese procurement entity and actual damages stemming from its attempt to remedy the pre-existing issues with FICE.

## IV.    Defendants Misrepresented and/or Failed to Disclose Misconduct and Fraud within FICE

73.    In addition to their failure to transfer fully FICE or to remain in compliance with Chinese law as described above, Defendants allowed FICE to operate as effectively a rogue entity, without appropriate oversight.  This contravened the representations and warranties made in, without limitation, Sections 3.8(a), 3.11(a) and 3.19 of the SPA.  As Plaintiff discovered after the Closing, this left FICE vulnerable to fraudulent activity by its employees, including theft of company property, all of which occurred.

74.    For instance, Section 3.8(a) of the SPA provides that neither the Company nor any of its Subsidiaries had "suffered any theft, damage, destruction, or casualty loss in excess of $50,000 in the aggregate to the assets of the Company or its Subsidiaries," except as disclosed in the schedules to the SPA.  And, as set forth above, Section 3.19 contains a representation that "the Company, its Subsidiaries and each [of] their respective officers, directors, agents … and employees have complied in all material respects with and are in material compliance with all Applicable Laws."

75.    Section 6.1 of the SPA provides in relevant part for all representations, warranties, and covenants made by the Defendants to extend to (and survive) the Closing Date.

76.    Despite making these representations, Defendants knew of or were, at a minimum, highly suspicious of, improprieties in FICE's operations prior to the Closing, yet Defendants made no such disclosure to Plaintiff.

77.     FICE-related issues quickly surfaced after the Closing for Plaintiff.  Among other things, FICE's management in China refused to provide Plaintiff with access to relevant financial information such as invoices, vendor information, and bank statements.  Plaintiff also discovered that FICE's management had been engaged in fraudulent activities, including stealing company property, as acknowledged by several other FICE employees to Plaintiff after the Closing.

78.     After the Closing, Plaintiff gained access to historical documents which indicated that Defendants had experienced similar issues regarding obfuscation and mismanagement within FICE.  For instance, in May 2019, an attorney in Parent's legal department (Micaela Repetto Rolon) requested business information from FICE's manager, including information regarding intellectual property and records on FICE's spending and billing.  FICE's manager responded, in effect, that FICE's files had been mismanaged.  Moreover, FICE never provided the requested information or otherwise complied with the investigation.  However, Defendants did not disclose the existence of this investigation or FICE's noncompliance to Plaintiff.

79.     Plaintiff further discovered—again, only after the Closing—that Defendants had also been aware of missing inventory and fraud by FICE personnel.  The CEO of LCI (Fabio Romano) had traveled to China in or about September 2019 to observe FICE's operations.  While there, Mr. Romano observed that FICE's reported inventory was almost non-existent.  He also observed improper billing and payment practices between FICE and vendors, as well as misconduct by FICE's manager.  Mr. Romano reported these issues back to key personnel of Defendants in September 2019, including Rodrigo Silva Ferreira and Dante Peroco Di Civita of the Internal Audit department.

80.     Defendants agreed that there were serious issues with FICE prior to the Closing, including misconduct by FICE's manager which Defendants determined constituted "corruption."

On behalf of Defendants, Mr. Ferreira coordinated the issuance of a formal warning to FICE's manager in October 2019, informing her that "TOTVS has considered it highly necessary to issue you a Warning Letter due to inappropriate behavior and violation of TOTVS Code of Ethics that occurred between you and the Bank employees in China during the previous months" and that "[w]e take this situation seriously."

81.    However, Defendants neither disclosed this misconduct to Plaintiff nor removed the manager from her position.  Nor did Defendants disclose any of the other observed issues, such as FICE's lack of inventory and improper billing practices.

82.    Defendants were aware of these serious issues affecting FICE prior to the Closing. Moreover, Parent's Chief Financial Officer, Gilsomar Maia, was the Treasurer of the Company and the Treasurer of LCI and therefore was aware, or should have been aware, of these issues (since FICE was a wholly-owned subsidiary).  Indeed, historical communications from before the signing of the SPA—including email communications from April 2019—reflect that Defendants (including Mr. Maia) were considering terminating or suspending FICE's operations.  However, Defendants did not disclose this to Plaintiff either.

83.    Given the rampant mismanagement and fraud within FICE, together with Plaintiff's continued inability to assume legal control over its operations, Plaintiff ultimately determined that FICE was unsalvageable after the Closing.

84.    As a result of Defendants' breach of representations and their omissions regarding fraud and other issues within FICE, Plaintiff has sustained damages in an amount to be determined at trial, including the portion of the Purchase Price paid attributable to FICE, as well as lost profits from failing to have a functional Chinese procurement entity.

**V.    Defendants Misrepresented and/or Failed to Disclose Liability Under Product Warranty**

85.    Additionally, Defendants failed to disclose extraordinary product warranty claims made against the Company in connection with a major product, the LDX900X-Aldi ("**Aldi Product**"), resulting in material liability for the Company.

86.    The Aldi Product is a double-sided display board which identifies an item being scanned and its price at the grocery checkout.  The Company has sold over 10,000 units of the Aldi Product since 2016 (*i.e.*, going back before the signing of the SPA).

87.    Data collected by Plaintiff shows that, since 2018, the Aldi Product has experienced an extraordinarily high failure rate of approximately 38.2%, which is much greater than the 0.5-3% failure rate of comparable products.

88.    The warranty period for the Aldi Product is three years.  Plaintiff has faced a material number of warranty claims regarding purportedly defective Aldi Products following the Closing, including claims which arose before the Closing.

89.    The extraordinary failure rate of the Aldi Product has caused unforeseen material losses for Plaintiff, which has been saddled with the substantial repair costs in connection with the warranty.  To date, Plaintiff has incurred at least $143,080 in damages for repair costs for the Aldi Product, with further damages expected as new warranty claims continue to arise.

90.    Defendants did not disclose the existence of such performance issues with the Aldi Product, nor were such potential warranty costs reflected in the Company's financial statements provided to Plaintiff in connection with the SPA.

91.    In Section 3.6(a) of the SPA, Defendants represented in relevant part that they had provided to Plaintiff true and correct copies of the Company's financial statements which had been prepared in accordance with Generally Accepted Accounting Principles (GAAP) and which "fairly

present the financial condition of the Company on a consolidated basis as of the respective dates they were prepared and the results of the operations of the Company on a consolidated basis for the periods indicated."

92.     In Section 3.7 of the SPA, Defendants represented, in relevant part, that "neither the Company nor any of its Subsidiaries has any undisclosed material obligations or liabilities arising out of or relating to the operations of the Companies or its Subsidiaries at or before the Closing[.]"

93.     According to the Financial Accounting Standards Board (FASB), warranty expenses should be recognized when they are probable and can be estimated.

94.     Considering that the Aldi Product was already failing to an extraordinary degree in 2018, Defendants should have disclosed this issue and should have provided the necessary liability or reserve in the Company's financial statements.  Defendants' failure to do so constitutes a breach of, at a minimum, Sections 3.6(a), 3.7, 3.8(e) and 3.13 of the SPA, and Plaintiff has been damaged accordingly.

**VI.     Defendants Misrepresented and/or Failed to Disclose Workers' Compensation Liability**

95.     Defendants also failed to disclose a pre-existing material liability owed by the Company to a worker's compensation self-insurance group.

96.     After no payment was made, the self-insurance group brought a lawsuit against LCI, along with other defendants which also allegedly owed funds.  *See Business Council Workers' Compensation Manufacturers Group Self-Insurance Trust v. Acorn Industries, Inc., et al.*, Index No. 900867-21 (Supreme Court of New York, Albany County).  Plaintiff engaged counsel and eventually reached a settlement with the insurance group.

97.     Plaintiff incurred material expenses in defending and settling the lawsuit, including attorneys' fees.

98.     Defendants did not disclose the existence of this material liability in LCI's financial statements, in violation of Sections 3.6(a) and 3.7 of the SPA.

99.     Defendants' failure to disclose the existence of this material liability also breached Section 3.14 of the SPA, in which Defendants had represented that they had disclosed all "actions, suits, proceedings, orders, judgments, decrees or investigation pending or, to the Seller's knowledge threatened against the Company or its Subsidiaries" on the accompanying Schedule III.3.14.  That Schedule 3.14 did not identify the pre-existing liability.

## VII.    Defendants' Violations of Non-Competition and Non-Solicitation Covenants

100.    In addition to the numerous representations, warranties, and covenants of the SPA set forth above, Defendants have also breached the non-competition and non-solicitation covenants contained in Sections 7.5(a)(i) and (ii), including with respect to product names used by the Company and/or its Subsidiaries.

101.    As noted above, Plaintiff understood that Defendants were contemplating selling a portion of their business in Brazil to a third party (though not the Logo).  Plaintiff therefore negotiated for non-solicit and non-compete provisions in the SPA which would bind not only Defendants but also Defendants' successors and assigns.

102.    Among other things, Plaintiff sought to limit any successor's ability to compete with the Acquired Entities following the Closing.  Accordingly, Section 7.5(a) of the SPA provides in part that Defendants (as well as their affiliates, successors and assigns) would not compete with the Acquired Entities other than in a limited number of South American countries (along those lines, pursuant to Section 7.5(c) of the SPA, Seller and its affiliates retained the right to use the

name "Bematech" in Argentina, Uruguay, and Paraguay, provided that such usage was limited to sales to third parties in those countries which had their principal place of business in Brazil).

103.     Section 7.5(a) further provides that Defendants (and their affiliates, successors, and assigns) would not sell to or solicit any party which had been a customer of any of the Acquired Entities in the previous year, regardless of that customer's location.

104.     As set forth above, Parent and/or Seller did indeed sell or assign certain business assets to a third party (Elgin) after the signing of the SPA, including, purportedly, the Logo. Assuming the validity of these transactions, then Elgin is their successor and/or assign.  As such, Defendants have an obligation to cause Elgin to comply with Section 7.5 of the SPA.

105.     Since that transaction, Elgin has been competing with the Acquired Entities in contravention of the SPA.  Elgin's competitive acts include acquiring products from the Acquired Entities' suppliers (including through vendors in China) and then selling those products under the same product names as used by the Acquired Entities, while using the brand name "Bematech Brazil" and the Logo.  In other words, Elgin has been using the Acquired Entities' vendors in China in order to make what are effectively copies of the Acquired Entities' products and then sell those products itself.

106.     For example, one of LCI's pre-existing products is the "SB1015", an all-in-one display computer, depicted below:



107.    Meanwhile, Elgin, purporting to do business as "Bematech Brazil," lists for sale on its website an all-in-one display computer that is also called the "SB1015", depicted below:



108.    Additionally, Plaintiff has confirmed that Elgin (through "Bematech Brazil") has been purchasing materials from one of the Company's top suppliers (as identified in the SPA) in order to make its own "SB1015" product.

109.    This activity by Elgin violates the SPA, as the SPA provides that Plaintiff (not Elgin) was to acquire exclusive rights to such products and the associated product names.

110.    To date, Plaintiff has been deprived of approximately $650,000 in lost sales from LCI's SB1015 product as a result of Elgin's unauthorized competition and copying of LCI's product names.  When accounting for the lost sales of certain other products due to Elgin's improper competition and use of the product names, LCI's losses (and by extension, Plaintiff's losses) are even greater.

111.    Additionally, a further violation of Defendants' non-solicitation and non-competition obligations occurred when Elgin solicited the business of HPTI Sistemas Y Equipamientoes S.A. ("**HPTI**"), which was identified in the SPA as one of the Company's top existing customers.  HPTI's principal place of business is in Asunción, Paraguay.  Upon

information and belief, an employee affiliated with Elgin traveled to Paraguay on or about November 11, 2019 to train HPTI personnel on competing products sold by Elgin. This activity violated the non-competition and non-solicitation provision in the SPA, including Section 7.5(a) with respect to soliciting existing customers of the Acquired Entities.

112.    In the two years following Elgin's improper solicitation of HPTI, sales by the Company and/or LCI to HPTI decreased by approximately 35%, resulting in additional estimated damages to Plaintiff of at least $311,000.

113.    When Plaintiff brought these violations of the non-competition and non-solicitation provisions by Elgin to Defendants' attention, Defendants refused to address Elgin's conduct (despite Elgin's status as Defendants' purported successor and/or assign). Defendants have further refused to indemnify Plaintiff for its resulting losses, in violation of their obligations under the SPA.

114.    Defendants' failure to observe and/or to cause Elgin to observe the restrictions in Sections 7.5(a) and 7.5(c) of the SPA is a serious and material breach of covenant under the SPA that has resulted in substantial damages to Plaintiff in an amount to be determined at trial.

## VIII.   Defendants Refuse to Provide Indemnification

115.    Pursuant to Section 6.2(e) of the SPA, a party seeking indemnification under the SPA shall give written notice to the other party after "discovering the liability, obligation, or facts giving rise to such claim for indemnification, describing the claim, the amount thereof (if known and quantifiable), and the basis thereof."

116.    On August 24, 2021, Plaintiff, through its counsel, provided such written notice to Defendants of the claims discussed herein, as well as Plaintiff's intent to offset the outstanding balance of the Note against the losses suffered by Plaintiff pursuant to SPA Section 6.2(f). Upon

a subsequent request of Defendants' counsel, Plaintiff provided additional information and numerous documents supporting its indemnification claims on or about January 26, 2022.

117.    Nonetheless, Defendants have refused to comply with their obligations to indemnify Plaintiff.  On March 25, 2022, Defendants' counsel informed Plaintiff's counsel that Defendants would not provide indemnification for the above-mentioned claims, with the possible exception of claim regarding the lapse of the Mexican Mark, *see supra* ¶¶ 36-43, which Defendants' counsel said was "under further review."  However, Defendants have not provided any funds to Plaintiff at this time.

118.    Among other things, Defendants' counsel asserted that Plaintiff was aware or should have been aware of the nature of Defendants' misrepresentations and omissions based on information that was purportedly available to Plaintiff during due diligence.

119.    Defendants' refusal to indemnify is wrongful and, moreover, contravenes Section 6.2(h)(i) of the SPA, which states in relevant part that "[t]he representations, warranties and covenants of the Indemnifying Party, and the Indemnified Party's right to indemnification with respect thereto, shall not be affected or deemed waived by reason of any investigation made by or on behalf of the Indemnified Party (including by any of its representatives) or by reason of the fact that the Indemnified Party or any of its representatives knew or should have known that any such representation or warranty is, was or might be inaccurate…."

## CAUSES OF ACTION

### COUNT I
**(Breach of Contract – Breach of Representations and Warranties)**
**(Against All Defendants)**

120.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth in this paragraph.

121.     The SPA by and among Plaintiff and Defendants is a valid, legally enforceable written agreement.

122.     Plaintiff has substantially performed its obligations under the SPA.

123.     In contrast, Defendants have breached representations and warranties under the SPA as set forth above, including but not limited to those contained in Sections 3.1, 3.2, 3.6, 3.7, 3.8, 3.10, 3.11, 3.13, 3.17 and 3.19 thereof.

124.     As a direct and proximate result of Defendants' breaches of the SPA's representations and warranties, Plaintiff has suffered and continues to suffer significant damages in an amount to be determined at trial.

### COUNT II
**(Breach of Contract – Non-Competition Covenant)**
**(Against All Defendants)**

125.     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth in this paragraph.

126.     The SPA by and among Plaintiff and Defendants is a valid, legally enforceable written agreement.

127.     Plaintiff has substantially performed all of its obligations under the SPA.

128.     In contrast, Defendants have breached Section 7.5 of the SPA by failing to cause Defendants and/or their affiliates (including Elgin, as successor and assign) to comply with agreed-upon restrictions regarding the post-Closing operations of Defendants and/or their affiliates (including Elgin).

129.     As a direct and proximate result of Defendants' breach of Section 7.5 of the SPA, Plaintiff has suffered and continues to suffer damages in an amount to be determined at trial.

## <u>COUNT III</u>
### (Breach of Contract – Failure to Indemnify)
### (Against All Defendants)

130.     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth in this paragraph.

131.     The SPA by and among Plaintiff and Defendants is a valid, legally enforceable written agreement.

132.     Plaintiff has substantially performed its obligations under the SPA.

133.     In contrast, Defendants have breached Section 6.2(a) of the SPA by failing to indemnify Plaintiff for losses incurred by Plaintiff in connection with Defendants' breaches of representations and warranties and covenants of the SPA.

134.     Plaintiff provided written notice to Defendants of its indemnification claims on August 24, 2021, in accordance with the notice procedures set forth in the SPA.  Plaintiff provided additional information and numerous documents supporting its indemnification claims on or about January 26, 2022.

135.     Nonetheless, Defendants have refused to comply with their obligations to indemnify Plaintiff pursuant to the SPA, with the possible exception of losses suffered by Plaintiff in connection with the Mexican Mark (though Defendants still have not provided any such indemnification to Plaintiff to date).

136.     As a direct and proximate result of Defendants' breach of their obligations to indemnify Plaintiff, Plaintiff has sustained damages in an amount to be determined at trial.

## COUNT IV
### (Breach of Implied Covenant of Good Faith and Fair Dealing)
### (Against All Defendants)

137.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth in this paragraph.

138.    The SPA by and among Plaintiff and Defendants is a valid, legally enforceable written agreement.

139.    Plaintiff has substantially performed its obligations under the SPA.

140.    The SPA is governed by New York law, under which all contracts imply a covenant of good faith and fair dealing in the course of performance.  The covenant of good faith and fair dealing provides that a party shall not do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

141.    In entering the SPA, Plaintiff sought to acquire a business that designs and builds its own products.  Defendants deprived Plaintiff of the fruits of the SPA by stripping the Company of its Proprietary Rights prior to Closing (including by assigning away the Logo and by failing to preserve and deliver essential Design Documents).  As a result, Defendants made the Company substantially less valuable than what Plaintiff had bargained for.

142.    Defendants further deprived Plaintiff of the fruits of the SPA, and thus materially breached the covenant of good faith and fair dealing, by knowingly misleading Plaintiff into believing that FICE's operations were sound and in compliance with applicable laws.

143.    As a direct and proximate result of Defendants' conduct, Plaintiff has sustained damages in an amount to be determined at trial.

**COUNT V**
**(Fraudulent Inducement)**
**(Against All Defendants)**

144.     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth in this paragraph.

145.     At the time the SPA was executed and also at the time of Closing, Defendants made material misrepresentations and/or omissions regarding the assets and Proprietary Rights to be conveyed pursuant to the SPA, including by failing to disclose the assignment by Seller and/or Parent of the rights to the Logo to a third party (Elgin).

146.     Defendants knew, or were reckless in not knowing, these misrepresentations and/or omissions to be false and misleading because Defendants were simultaneously negotiating with Elgin and, upon information and belief, Defendants did assign the Logo to Elgin.

147.     In addition, Defendants made material misrepresentations and/or omissions regarding FICE's mismanagement and operations, as well as regarding its legal representative and compliance with applicable laws.

148.     Defendants knew, or were reckless in not knowing, these misrepresentations and/or omissions to be false and misleading because Defendants were aware of the organizational and operational issues with FICE, including with respect to misconduct by FICE personnel.

149.     Defendants made the misrepresentations and/or omissions described above with the intention of inducing Plaintiff's reliance thereon and so that Plaintiff would enter the SPA and close the transaction.

150.     In reliance on Defendants' material misrepresentations and/or omissions, Plaintiff executed the SPA and closed the transaction.

151.    Plaintiff's reliance was reasonable because the false nature of Defendants' misrepresentations was solely within Defendants' knowledge and Plaintiff had no practicable means of ascertaining the truth.

152.    As a result of Defendants' misrepresentations and/or omissions, Plaintiff has suffered damages in an amount to be determined at trial.

## COUNT VI
### (In the Alternative, Negligent Misrepresentation)
### (Against All Defendants)

153.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth in this paragraph.

154.    In the event the false statements or omissions set forth above were not made with knowledge or reckless disregard as to their falsity, then they were made negligently and without due care by Defendants.

155.    As parties to the SPA, Defendants jointly and severally owed a duty to Plaintiff to exercise reasonable care in making representations and avoiding omissions of material information in connection with the SPA.  Specifically, due to Defendants' unique knowledge, which was not otherwise ascertainable to Plaintiff, Defendants had a duty to disclose to Plaintiff the relevant and material facts related to the transaction.

156.    Defendants negligently made material misrepresentations and/or omissions regarding the assets and Proprietary Rights to be conveyed pursuant to the SPA, including failing to disclose the assignment by Seller and/or Parent of the rights to the Logo to a third party (Elgin).

157.    Defendants were negligent in not knowing that these misrepresentations and/or omissions were false and misleading because Defendants were simultaneously negotiating with Elgin and did assign the Logo to Elgin.

158.     In addition, Defendants negligently made material misrepresentations and/or omissions regarding FICE's mismanagement and operations, as well as regarding its legal representative and compliance with applicable laws.

159.     Defendants were negligent in not knowing that these misrepresentations and/or omissions were false and misleading because Defendants were aware of the organizational and operational issues with FICE, including with respect to misconduct by FICE personnel.

160.     In reliance on Defendants' material misrepresentations and/or omissions, Plaintiff agreed to enter the SPA and close the transaction.

161.     Plaintiff reasonably relied upon the misrepresentations and/or omissions because the false nature of Defendants' misrepresentations was solely within Defendants' knowledge and Plaintiff had no independent means of ascertaining the truth.

162.     As a result of Defendants' misrepresentations and/or omissions, Plaintiff has suffered damages in an amount to be determined at trial.

## COUNT VII
### (Declaratory Judgment)
### (Against All Defendants)

163.     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth in this paragraph.

164.     Title 28 of the United States Code, Section 2201, provides in relevant part:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

165.     The SPA by and among Plaintiff and Defendants is a valid, legally enforceable written agreement.

166.     Plaintiff has substantially performed its obligations under the SPA.

167.     As described above, Plaintiff has provided Defendants with notice sufficient to trigger Defendants' indemnification obligations.  However, Defendants have refused to indemnify Plaintiff for its losses.

168.     Plaintiff is entitled to payments from Defendants for losses suffered in connection with Defendants' breaches of representations and warranties and covenants.  Additionally, by failing to perform as required under the SPA, Defendants have failed to provide the agreed-upon consideration to Plaintiff.

169.     Plaintiff has also notified Defendants that it has offset a portion of its damages against the outstanding balance of the Note pursuant to Section 6.2(f) of the SPA, which provides that any indemnification amounts "shall initially be [] offset against the outstanding balance of the Note and paid in cash by Seller within thirty days."

170.     Defendants have informed Plaintiff that they dispute Plaintiff's right to offset its damages against the Note and have insisted that Plaintiff must pay the outstanding balance of the Note (including interest) in full when it becomes due on November 5, 2022.

171.     An actual controversy exists between Plaintiff and Defendants concerning Plaintiff's obligations to Defendants under the Note due to Defendants' breaches of the associated SPA and Defendants' failure to provide consideration for the Note.

172.     Plaintiff seeks a judgment from the Court declaring that Plaintiff is not required to pay the outstanding balance of the Note or otherwise perform any remaining obligations to Defendants thereunder due to Seller's failure to deliver consideration therefor.  In the alternative, Plaintiff seeks a judgment from the Court affirming that Plaintiff may offset the balance of the Note against the losses Plaintiff has suffered in connection with Defendants' breaches of the SPA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court judgment in favor of Plaintiff and against Defendants as follows:

A.  Awarding damages to Plaintiff in an amount to be determined at trial for losses sustained as a result of Defendants' breaches of representations and warranties and covenants in the SPA, as well as all damages—including punitive damages—resulting from Defendants' fraudulent and/or negligent misrepresentations and omissions which induced Plaintiff to enter into the SPA;

B.  Issuing a declaratory judgment clarifying, affirming and declaring that Plaintiff is not required to pay the outstanding balance of the Note or otherwise perform any remaining obligations to Defendants thereunder; or in the alternative, issuing a declaratory judgment clarifying, affirming and declaring that Plaintiff may offset the balance of the Note against the losses Plaintiff has suffered;

C.  Awarding Plaintiff its attorneys' fees and costs in bringing this action, as well as pre- and post-judgment interest; and

D.  Awarding such other relief as this Court may deem just and proper.

Dated:   New York, New York
         September 14, 2022

SULLIVAN & WORCESTER LLP

By: */s/ Christopher K. Shields*
     Michael T. Sullivan
     Christopher K. Shields

1633 Broadway, 32nd Floor
New York, New York 10019
Telephone:  (212) 660-3000
msullivan@sullivanlaw.com
cshields@sullivanlaw.com

*Attorneys for Plaintiff Bematech Holdings LLC*

39